Your Honor, Ken Graham appearing on behalf of Mr. Brubaker. I want to start by discussing why this case... Mr. Graham, hang on just a second. I want to make sure that we've got Mr. Rappaport, can you hear us? Yes, Your Honor, I can. Thank you. So everybody's here and present. Now, Brubaker v. Tucson. Mr. Graham, please do go ahead. Thank you, Your Honor. I want to start by discussing why this case is so important. This case involves the intersection between two of the most... of our most treasured important constitutional rights. And those are the Fourth Amendment right to be safe in your home from the state breaking down your door based upon a warrant that was obtained using false evidence and the right to a jury trial of your peers in order to decide whether that occurred. And really the question is who should decide whether officers who make or cause to be made false statements in an affidavit did not intend to make those false statements? Is it a federal judge or a jury who sits together to bring the community's insights as to whether to believe the officer's denial? Jurors who make decisions every day as to whether what they are told they should believe. The rule we have established on when the jury should decide require that a jury should decide this case. And the rule is that all evidence and reasonable inferences from those facts are to be construed in favor of the party opposing the motion for judgment as a matter of law. And that rule is there to ensure that it's only in cases where the facts can be and those facts fail to show the violation occurred, that a court can properly take a case from the jury. And that is not this case. Mr. Graham, can I interrupt for just a second and ask you to go to your point? Is there any evidence in the record from which a jury could find that the the magistrate judge on the procurement of the affidavit? And then I'll ask a question regarding recklessness. Yeah, I think the question is not whether they intended to give false statements, but whether they intended to make the statements that were false. No, that could be done by mistake, and it could be done by negligence, which would not be a Fourth Amendment violation. The question is, is there any evidence of recklessness or intentional judicial deception? Yes, there is, Your Honor. OK, tell me about that. The evidence is, is that in city court proceedings, approximately, I think maybe even eight, seven or eight years prior to the trial in the federal whether he had read the warrant affidavit and whether it accurately reflected what it was that he and Officer Pelton actually prepared to tell the court. And his response was, yes, it was. Yes, it is. So he admitted that what they told the court is what they intended to tell the court, what they had prepared to tell the court. Now, and what was reckless or intentionally mischievous about that? Well, if you if what you said is what you intended to say, then the intent is shown by the fact that you you said it. I don't think so. I think you've got to show there was an intent to mislead the magistrate or there was recklessness in the statement made that did, in fact, mislead the magistrate. Well, with respect, your honor, in Bravo versus City of Maria, this court specifically said that the plaintiff does not need to establish specific intent to deceive the issuing court. I agree. To show recklessness. So I think the question is, what what should the officers have done more that was reckless not to do? Well, I think that you get to the recklessness only if you don't show the statement. It seems like recklessness is easier for you to show. So tell us how you can show recklessness. OK, well, we can show recklessness in part, your honor, by the manner in which they decided to present this to the magistrate, which was for Woolridge to meet with the informant separately, provide information to Officer Pelton and then absent himself from the affidavit process during the course of Officer Pelton telling the court things that turned out to be false, including not only that they had information that Mr. Ruebaker's office or house was being used for dealing drugs, but also that the individual had gone to the back door of that vehicle. It seems like part of your argument is also omissions about the criminal history. Absolutely. And and Officer Pelton admitted that he intentionally did not provide that information because he thought he was already taking too much time of the magistrates, too much of the magistrates time in in doing the in preparing and giving the affidavit. I mean, there's no dispute that that Mr. Deal lied to Mr. Pelton on three occasions and that this information was not provided. But your omissions include his initial statements to the officers, but then also the officer's failure to look at his criminal history. Yeah, well, that's true. And especially when Officer Woolbridge told the court and told the jury in this case that they were in no hurry. He had asked and he this is something also in the record is that he had asked that. Oh, and I lost my train of thought. I lost my train of thought. I'm sorry, what was your question again? So I can I was just trying to understand whether your recklessness argument turns on these omissions about the initial false statement about looking for work and then    finding out that he had a criminal history of false statements to police. OK, and in regards to him finding out about the false statements in the thing, he also admitted in the prior testimony that, in fact, he knew that that state that the statement was not accurate. So. I don't know if that answers your question with this a little bit. I've got the the transcript of the telephone call to the judge who issued the warrant, and it's a little unclear to me whether or not in getting that in making that statement, Pelton is reading off of a prepared affidavit or he's reading from or he's sort of working off of bullet points and he's sort of freewheeling and describing that. Do we know whether he was reading off a written out affidavit? It had precisely those words or that he is working off of bullet points that make those points. But he's using his own words. Do we know that for sure? We don't know that, your honor. Officer Woolridge testified that they used bullet points. Officer Pelton said that he believed they used bullet points. But that that explanation in itself, your honor, is really, you know, is reckless if that's how they decided to present it, if they didn't write it out. I mean, a telephone, a warrant ordinarily before we had telephone warrants was something that was written out and you provided to give somebody who doesn't have the actual information. Because remember, Woolridge interviewed Deal when Pelton wasn't present. Most of the information. The time is running. So let me try and make my point as best I can. I mean, there's a basic problem with these telephone warrants because you don't have sort of a written affidavit that signed that the judge has in front of the judge and so on. It's dependent on what the conversation is. And if it's working off of bullet points rather than reading from a prepared affidavit that later shows up in the record, you're then forced to deal with sort of the human frailty of imprecise speech. And we've got two points in the transcript that are clearly mistakes, that is to say they're just wrong. One of them is, well, he went to the back door. No, he didn't go to the back door. He went to the back gate. I think that's the less serious of the two. The other one is, and that's very important. At the very beginning, I came in contact with O'Donnell Deal, he was in the area of a residence, and he had received information from concerned citizens that they were selling narcotic drugs. Now, as I read that, if I'm just reading it precisely as as now written on the page, and this is certainly the way the prior panel of this court read it, it is saying that we have information that drugs were being dealt from this residence. Now, if somebody is saying that orally, you get word salads all the time. And I'm not sure whether that is an intentional misstatement. I'm not even sure because I haven't heard the transcript. Sometimes when you hear it, you understand by emphasis of the words that, in fact, what they're really saying is what would have been the truth is that they did have citizen complaints about drug dealing from the area, not drug dealing from the house. Now, later on in this same thing, he says, actually, we didn't know which house it was. We we had to go look for the house. So which leads you to say, well, maybe he maybe what he really meant was from the neighborhood rather than from the house. What do I do with the fact that this may be imprecise speech rather than a careful writing down of an affidavit that's just that's wrong? OK, well, number one, I think it's reckless to leave that very important back to something that's not precisely written down. Number two, in making a determination as to whether to believe their explanation that they didn't intend to do it, you have to take into account what they say as to why it isn't what they intended to do and what they say as to why is something that a jury could very easily determine is just simply not true because officer or Sergeant Woolridge had admitted that that is what they that it did set forth what they intended and what they had prepared. But not only that, but that the. So this whole idea that that Sergeant Woolridge absented himself intentionally from the proceedings because his sergeant had read a magazine and talked to him about what was going on in the magazine while he was talking to a judge is why he didn't participate in this meeting. That's just simply ridiculous. Any juror could say that makes no sense. If you don't want to bother somebody by reading a magazine while they're talking to the judge, don't read a magazine. Well, no, it's not that his superiors reading the magazine. His point was that the presence of my superior made me nervous and I don't want to make Pelton nervous because he hasn't done this before, which raises my own problem with at that point, Pelton is either a seven or eight year veteran of the force. I mean, he's not some rookie who's trying to figure out how to do this. Yeah, it's absolutely true, your honor. It's it's an unbelievable explanation, or at least it's an explanation that a jury could clearly find is unbelievable. Well, but if that but once the jury says, well, that's kind of silly. Maybe he had to go to the bathroom. Maybe we wanted to go to lunch. Maybe he's trying to make up an excuse as to why he wasn't supervising. But how does that feed into a case that helps you a narrative that helps you? Well, because he didn't give that excuse. He said he did it deliberately. He said he deliberately absented himself because of a reason that makes no sense and is reckless. But what if he said, I deliberately absented myself? I mean, the fact is, he's not there. And is it your contention that his deliberately absenting himself is part of the recklessness when, in fact, he's not the person presenting the information? It provides cover, your honor, in the eventuality that somebody actually discovers the false statement and brings the issue. And you can then you can say, well, I wasn't there. So the fact that what we told the judge was different than what Peltier deal told us is simply a mistake. So who makes the decision as to whether to believe that testimony? I should be. We're going to take you over time. I can just see this happens. This is a difficult enough cases I think we're doing. How much of your case is dependent upon the fact that they had information available to them had they done the research that would have shown the deal not only had prior convictions, but there were convictions for providing false testimony. Well, it's important, especially since Woolridge said we're in no hurry. And the point that I was going to make before, and I lost my train of thought, was that Sergeant Woolridge testified in city court that they weren't in any hurry, and that he had asked for a criminal record, not for the information in order to determine whether or not he would be qualified to serve as an informant. And the other important omission is they told the city court or the magistrate that officer or the deal was not receiving any benefit from the information that he was getting. Tell the magistrate that they were referring him to another sergeant in the same division who was going to potentially give him a benefit from this entire situation. I'd like to be able to address the damages issue at some point if you want that, or I'd be glad to talk more, answer any questions. Why don't you lay that out very quickly and then we'll go to the other side. I mean, the basic issue in regards to the damages is whether or not the exclusionary rule allows that the basis for the all the damages is the utilization of the exclusionary rule. We did not seek to exclude any evidence in this case. What we sought to do in this case was to show that the evidence that was gathered was not incriminating evidence. And in fact, he was Mr. Brubaker was acquitted overwhelmingly of almost all the criminal charges. And the charges that he was convicted of were charges that were still being challenged in the Superior Court on the appeal based upon the sufficiency of the evidence and the applicability of the statutes. So those issues were not addressed by the Superior Court because the Superior Court found that the warrant was bad. But the evidence is not incriminating evidence and we should be able to get damages for Mr. Brubaker having to defend himself in court since we're not asking for the exclusionary rule to prevent the evidence to show that he was guilty. It seems like you're arguing there's an explanation for all these cats that would show that he's innocent. But are you saying there wasn't even probable cause to prosecute him for the animal mistreatment charges? Absolutely, Your Honor. I mean, he was charged with 50 charges each, I think, 40, I forget the exact number, of no water, no food, no proper place for them to live, not having a proper cage. The police reports and the animal control reports clearly show and the videos clearly show there was water, there was food, there were cages. So there was absolutely no probable cause for those particular charges. What was the smell of death? And I mean, there was clearly evidence that something was wrong in this house once the officers were inside. Yeah, there was a smell. There was the smell. And there are photos of cages with feces in the cages. But there was also testimony that the smell was not bad. And there's also testimony that these cats. That doesn't mean there's not probable cause. I mean, it's a different thing to say you might eventually win and to say that the prosecution couldn't happen at all. And it seems like once you have there being probable cause, everything that happens after with the prosecution, it's hard to see how you could get damages for that. But that was not the matters that were related to the smell were not the criminal charges. The criminal, those were involved in the forfeiture of the cats because of the condition of the cats. There were criminal charges because of the condition of whether there were ear mites in the debilitating ear mites in the charge or in the in the ears of some of the cats. But the evidence, there was no evidence that it was debilitating, which is a requirement under that statute. So there was no probable cause for a violation of that statute since it required debilitation, not just that some cat had ear mites. Yeah. And it was something that there was testimony that he did provide. And I'll point out that they didn't see any ear mites until they came back the next day, despite that they're there with their flashlights and they're examining these cats. They they let they only sees four or five animals that that night. And then they sees the remainder of the animals when they came back with Officer Woolbridge the next day to to to seize them. OK, I think we have your position in mind. Let's hear from the other side and we'll give you a chance to respond.  James Rappaport. Thank you, Your Honors, and may it please the court and counsel. My name is James Rappaport and I represent the city of Tucson and Tucson Police Sergeant Jack Woolridge and Tucson Police Officer Michael Pelton. Before I get into the before I get into my main argument, I would like to correct a few things from counsel's argument, if I can. From the get go, Your Honors, it's uncontradicted that Officer Pelton did use bullet points and didn't write out a script verbatim. So to Judge Fletcher's question, it was more of a freewheeling, it was more freewheeling than just a verbatim script. I also want to unpack a couple of things from counsel's brief. Mr. Graham did mention a couple of times that I mistakenly relied on criminal cases when discussing the standard for overcoming a rule 50 verdict in a section 1983 judicial deception case like this. I want to draw the court's attention to Lombardi versus city of El Cajon. It's the same standard that's in a Frank's hearing. They adopted the same standard from the criminal law and that standard is a substantial showing that the affiant intentionally or recklessly omitted facts required to prevent the statements from being true or that they intentionally or recklessly made up things. So it would require an intentional lie. Well, no, or a reckless statement. That's correct, Your Honor. And to counsel's point in the beginning about intent and recklessness and just whether making the statement itself is intentional because one intends to speak. I think he's conflating intent and volition. The intent requirement here is that it is a it has to be a known and truth presented as truth to be a to be an intentional misstatement or if it's with reckless disregard for the truth, it has to be made with subjective knowledge that there is a high likelihood the statements are untrue. And that's another point in counsel's brief. I think I understand the basic structure of the law. So let me get down to brass tacks in terms of what actually was said to get the warrant. That first sentence that says we have evidence, we have we have we have committed reports of drug dealing out of this house. That's that's just false. And if you read that on the page grammatically, the statement is unambiguous. Now, we said that in the Mem Dispo when we sent it down before. I understand that Judge Burry viewed it as ambiguous. That's what he says as he's granting your motion. But I don't view it as an ambiguous at all. But that's if it's a written statement that someone has written carefully. What do we do with somebody who is speaking it orally and is that I have not listened to the tape. Is the tape available to us that recording? Maybe I want to listen to that tape, because sometimes you hear intonations. What on the page seems to say one thing unambiguously, maybe a pause or an emphasis or something else would make it ambiguous or make it clear that he is just giving us a word jumble and he can't talk straight to save his life. I mean, I don't know. But if I read it just on the page, there's no ambiguity whatsoever. And if this were a written statement, I would regard it as a reckless misstatement, whether or not intentionally designed to mislead the court. That's another question. But I would regard this as reckless. Were it written down? Did we regard it as reckless for not having been written down? That is to say, if I'm a careful officer, what I think I might want to do is write it down, look at it carefully and then read it, because this is a critical point. And to your point, Judge Fletcher, I want there's a lot to unpack there. And I want to start from the beginning that, yes, the recording is in the record. It was admitted into evidence and it was played before the judge and jury in this case. And I think Your Honor is exactly right. Do we have it in our appellate record? I mean, and then in the ERs and so on. Do I have it back in my chambers? You know, Your Honor, I don't know the answer to that. I'm not sure if the actual recording. I can play the other. I can get my hands on it. I haven't heard it either. So it would be interesting to know if you could point us to whether we have it. I don't know, Your Honor, if it's actually in the excerpts of record, but it is it was admitted into evidence below. But to the point, to the premise that if you're just reading it on the page, it's clear that it's made with respect to a certain house. That's what the previous panel on interlocutory review found. And that's actually what Judge Brey found in denying qualified immunity in this case. But I do feel compelled to read the sentence because it is ambiguous. And I don't think that we can just assume from the get go that you're going to try to persuade me that that sentence read literally and carefully is ambiguous. You're going to lose my vote on that on that particular point. I don't say lose the case, but I've read that sentence many times. And if I read it carefully, it is not ambiguous. You can maybe persuade my colleagues, but you can't persuade me. And fair enough, Your Honor. And if you do take that sentence in isolation, literally, I think you might have a point. But in context of the entire affidavit, Officer Proton says, I will I will tell them, tell you, Your Honor, that we don't have we don't have the address. We don't we haven't confirmed the address in this case. That's ambiguous. That could mean we don't know which house it is or it could mean we don't know the number of the house. And I think, Your Honor, either way, they have the eyewitness that guides them turn by turn back. And Officer Pelton knows this while he's swearing out the warrant. And that eyewitness three times identifies the house and says, I'm buying drugs at that house. Respectfully, Your Honor, that's probable cause. And that I didn't argue this in the brief because I don't think the probable cause if he's not reliable. And if we'd known that he had given false statements so many times, then I think you would have a problem with his reliability, wouldn't you? I don't think so, Your Honor. And I say that for a couple of reasons. So to the extent Your Honor's talking about the false statements when Officer Pelton initially talks to him, to Mr. Deal and says, you know, what are you doing in the area? I'm looking for work. That was not the whole truth. Or do you have drugs or drug paraphernalia on your person? No, I don't. That was obviously untrue. But the question is, are those statements material? And I don't think I'm more interested in the criminal history of false statements to the police. So, Your Honor, I think then the United States versus Miller is very instructive. And I think it sets a bar for us that it isn't enough that they didn't do everything. And in that case, it involved a it involved a confidential informant, which I do want to make that distinction here. Mr. Deal was not an informant at this point. They didn't make any promises of immunity or any kind of gain for him at this point. In Miller, though, the officers tried to find out the background and just didn't find out everything here. They didn't do anything to find out his background as far as we can tell. So, Your Honor, I think in Miller, if I remember correctly, it was it was local law enforcement that had done all of that legwork. It was the federal agents that didn't. They didn't do the background check or review the confidential informant's rap sheet. And my recollection is that it was the federal agents who were sued. And a panel of this court said that they and I should say the federal agents didn't know about the informant's perjury conviction in that case. And a panel of this court said that's still not enough, that that's still not recklessness. And again, I would point to the language in the Deloach versus Bevers case from the Eighth Circuit. And this this language appears in Eighth Circuit's in the context of Section 1983 judicial deception claims that to show reckless disregard for the truth, there has to be substantial evidence that the law enforcement officers themselves entertained serious doubts as to the truth of what they were saying. And there's just not enough evidence. Let me interrupt here. The suggestion has been made that the failure of Pelton and Woolridge to write out the affidavit, not just use bullet points, not just use conversation, but to write out the affidavit and then read from the affidavit was the creation of an unwarranted risk. Do we know, have we ever had any cases that say that a police officer has to write out the affidavit before he calls the magistrate? I don't believe that's the case, Judge Bea, I don't know of authority in the circuit or others. In my speckled career, I used to be a trial judge and I used to see affidavits and I used to see police officers coming at my home to get warrants, usually about dinnertime. So I have some experience in this area. Is there a rule of the Tucson Police Department that an officer calling in to a magistrate to give information on which a warrant can issue should have the affidavit written out before he calls the magistrate? Your Honor, I don't know of a specific Tucson Police Department policy, but to your question as to whether there's legal authority that requires officers like Officer Pelham to do that, I'm not aware of any and counsel didn't cite any in his brief. Maybe Mr. Graham knows some legal authority. I beg your pardon, Your Honor? Maybe Mr. Graham in rebuttal can give us some legal authority on that. To follow up on that point, I mean, I'm unaware of any authority that wouldn't make that a requirement, but I'm trying to figure out how this happened. And it may very well be that this was entirely innocent from the standpoint of Mr. Pelham. I mean, he might not have even understood precisely what he was saying. And say maybe it was sloppy, but I think it's entirely possible that he was acting innocently when he spoke those words. But, you know, I want to come back to the question that's actually the precise legal question in front of us. And that is, was there so little evidence of recklessness that Judge Bury was right to take it away from the jury? I mean, that's the question that's in front of us, not whether what we would have decided were we sitting on the jury. The question is whether it was there enough to get the jury. It seems to me that there might have been enough to get to the jury. Tell me why this case is so obvious that no reasonable jury could have found recklessness. Your Honor, I think there has to be substantial evidence to get to the jury. It is a heightened standard and Judge Bury is correct that there wasn't enough evidence to allow a rational juror to conclude. That's not that's different from substantial evidence. That's a we can look at this in various ways, but there was some evidence here of recklessness that you're trying to persuade us was insufficient and clearly persuaded Judge Bury that was insufficient. But there has to be so little evidence that no rational juror could have found recklessness. Help me understand why that standard is satisfied. It's satisfied, Your Honor, because the examples that counsel brings up of of the officers being reckless simply aren't reckless under the law within the meaning of a section 1983 claim. The, for example, the backdoor and backgate distinction from the warrant, those are legally the same thing. It would not have changed the magistrate's analysis. They're both entitled to the same protections under the to agree with you. Don't we need to say that the state court judge, the so I mean, this went through many our prior panel, the summary judgment ruling. I mean, there were at least three judges and three on our court. So probably five judges who thought there was enough to go to a jury here. What changed? I don't see how anything changed a trial that that really changes that. And so we would have to say that all five of those jurists were unreasonable to think that this shouldn't have gone to a jury. So, Your Honor, I think there are a couple of parts to that. The first is that what changed is that there was a trial, that there was cross examination. There were four days of evidence. And after that, I think it's important to note Judge Bury was the original judge. But Judge Bury believed the officers, I guess. But isn't that a determination the jury should make? I don't understand what happened at trial. It's not like a new fact came out. All it is is that all of a sudden now he believes the officers, which is a determination the jury needs to make. So respectfully, Your Honor, I don't think that's the case. I think what it was is that at the interlocutory appeal stage, at the summary judgment stage, there's always the possibility that something can develop at  that any of the officers intentionally lied or were reckless with regard to the truth within the meaning of that mental state in 1983 cases. But five jurists had already said that this statement and the omissions or I mean, that this record shows that there could be recklessness. And so I don't understand. I mean, did something new happen at trial other than that Judge Bury became convinced the officers didn't mean to do this? One thing I would say, Your Honor, is that on interlocutory appeal, the panel deferred to the trial court and said that we're not free to revisit their conclusion, that there's a factual dispute. And so they didn't revisit that. So I don't know that I would characterize it as. I don't think that's what our court said. Our court read the statement about the house and the neighborhood and said this means the house and that's enough that it could be reckless. It's but I believe that on the on the issue of intent and recklessness that it reversed or excuse me, it affirmed because it it didn't revisit any of the factual findings made by Judge Bury and the U.S. magistrate initially. Well, there can't be any factual findings on summary judgment. Wasn't that an appeal from summary judgment? Yes. So I'm not sure what you're talking about. All right. I apologize. The the issue was that they did find that there was a dispute of fact and that wasn't reviewable on interlocutory appeal. And that was a big part of the decision there. And in any event, it's not binding in this court. It this is this case had the benefit of trial. It had it went to trial and went in front of the judge and jury. And again, the same judge that said, yes, there are disputes of fact, the record might develop in a different way, found the record didn't develop that way and didn't. And I want to be clear, he didn't make credibility determinations. He didn't see any evidence of science or he didn't see any evidence. But when it's recklessness, you don't need I mean, it doesn't have to be intentional. So so what what what was missing or what what changed in terms of whether there was the potential for recklessness? Well, I think it has to do with counsel's argument about what constitutes recklessness, that was it recklessness for Sergeant Woolridge to leave the room? The answer is no, that's not reckless. Within the meeting of 1983, was it reckless that they didn't write everything out verbatim? Again, there's no authority that that's required. But OK, respond to it this way. Here's here's my quick summary that we can make to the jury as to why we think this is reckless. We misstate what we actually do know. We have available to us information that would tell us the deal is very unreliable, but we don't pursue that. And we then persuade the judge to give us a warrant based upon information that as we supplied it is incorrect and based on information that was supplied to us by an unreliable informant. Either one of those two things easily corrected, but we didn't do it. Why can't a jury say that's reckless? Respectfully, Your Honor, because the law didn't require them to do a criminal backroom check. He wasn't considered. I'm not talking about whether the law required it in some abstract sense. I'm asking why can't a jury say that was reckless to present this to the jury, this to the judge to get the warrant under these circumstances? Because if I had gotten or I think if I'd gotten a response from a jury that this was reckless, I'd have trouble overturning it. Your Honor, I think the issue is that as a matter of law, that's not reckless. That doesn't advance any recklessness within the meaning of a Section 1983 claim or any of the case law, the Chisholm case, the Miller case. I think it illustrates the kinds of things that constitute recklessness, the kinds of things that a magistrate reasonably needs to know before issuing a warrant. And our facts, with all due respect, are just not in the ballpark of the Chisholm case, for example. Back to Miller. Miller specifically says the officers made diligent efforts to find out about Becker's background. Their failure to uncover the perjury conviction can't be considered any more than negligence. So I think you're wrong about what Miller said back to that exchange earlier. I pulled up the case. Well, and I defer to Your Honor's reading of that, but I think in this case, the question is, are they required to do the criminal background check or is it reckless for them not to? And in Miller, it was a confidential informant that they had been dealing with for some time. Here, this is an eyewitness saying, I bought drugs at that house. He guided the officers there. And these were statements against penal interest. He wasn't promised anything in exchange for those statements. And every affidavit I always solve from a source before I issued a warrant had an adjective in it which was reliable, a reliable source. It seems to me that there's a subjective appreciation by every police officer that a source must be reliable in order to give his information to the judge for the case. Here, the source was unreliable and known or available to the officer. Isn't that the subjective appreciation of a risk and then failure to eliminate the risk? So, Your Honor, I think it would be if we had facts where they just walked up to him and he pointed to a house, but they spent a lot of time with him, as Judge Spence said, they spent time with this person, he guided them turn by turn from the station to the house without any promise of any benefit or any prosecutorial immunity and pointed to the house. They even drove him around the neighborhood and approached the house for multiple directions to verify that what he's saying isn't just him pointing to a random house. And so I think there, that's, could they have done more? Of course, there's no question about it. But in the context of a 1983 claim, is that substantial evidence of recklessness? And I don't really see how it shows that he's reliable, though. I mean, maybe maybe he bought drugs from the house next door and he's trying to send the officers on the wrong track. I mean, he was able to find this house multiple times, but he's a person who has convictions for making false statements to police. It turns out he had lied when he first encountered them. I mean, the fact that he can find the house for multiple directions, I don't really see how that tells them that they should trust him. Well, he also described the house, your honor, and he said it's a house with a tree in front of it. He described it wrong. I mean, he said it was white when it's only a white door. I mean, that may not be so material, but it's not like he described the house perfectly. You're correct. He didn't describe it perfectly. He did get the color wrong. It did have a white door, but he also got the color wrong. I mean, brick is different from white. I mean, it's probably a different mode of construction. You don't usually describe a house that's made out of brick as a white house. And that's a fair point, your honor. And I think it's cured by the fact that he guided them there from the station, turn by turn, and told them where it was. And I can appreciate that. Yes, this is not a perfect case. Could law enforcement have done more? Yes. But the law doesn't require them to do the criminal background check. It doesn't require them to turn over every stone. It's simply I think I think we're now getting into repetition. And are there further questions from the bench, though, on this point or on the from from Mr. Rappaport? OK, thank you. Thank you very much. Let's put three minutes on the clock for Mr. Graham. You're you're muted. There we go. I have no evidence. I have no authority that you are required to write out a telephonic warrant. But it is reckless to not write out the one point that the judge could have decided by itself was sufficient to issue a warrant. If it's a reliable informant, then that's all you really need, saying that we have a reliable citizen informant. We're not paying them. That's sufficient probable cause if they say that's the house. And one of the things that in the Washington case, you they forget it's something Chisholm versus Washington State. They talked about the issue of deciding whether something is intentional or whether it was inadvertent. Was this a mistake? And one of the things that they say in that case is if every misstatement and every omission is a misstatement or omission that would have questioned whether there was probable cause. A jury is entitled to find that that wasn't inadvertent. And that's the case here. In this case, everything that was false in that statement or in that affidavit and every omission would have cast doubt as to whether or not this was the correct house. There is a question about or counsel relies heavily upon the about the fact that Mr. Deal pointed out the house. He pointed out the front of the house. There was testimony from Mr. Woolridge. What evidence did you have that Mr. Deal had ever seen the front of the house? And I quote the response, he bumbles, he gives no coherent explanation as to how somebody who goes to the back gate would know what the front of the house looks like to point it out. If somebody lies about the back gate and says it was the back door, that's a jury can take and say, wait a minute, they lied about this. That was clearly wrong. That's not a mistake. How is that a mistake? Then why are we supposed to believe that they didn't lie about? They had information that Mr. Brubaker's there were drugs being sold from Mr. Brubaker's house. Unless there's any questions, your honor, I just think this is clear that your intuition is right, that there's at least recklessness in this case and that importantly, that the damages that were precluded were precluded on a motion in limine, not with any evidence. And we had substantial evidence to show that those damages were the proximate cause of these false statements that were made to the court and were not superseded by the fact that the only reason we were there is because of the only reason we're making those claims is solely because we avoided criminal responsibility because of the exclusion. That's simply not this case either. OK, thank you. Thank both sides for an interesting argument. Brubaker versus city of Tucson now submitted for decision. And that completes our argument schedule for this morning. So we're not a general. Thank you very much. Thank you, your honor.
judges: W. Fletcher, Bea, Friedland